UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL L. MCKUIN, | No. 2:19-cv-02153 DAD DB P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| ROBERT NEUSCHMID, | |
| Respondent. | |

Petitioner Michael McKuin, a state prisoner, proceeds pro se and in forma pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered on October 17, 2016 in the San Joaquin County Superior Court. Petitioner was convicted of first degree murder. Petitioner now claims: (1) ineffective assistance of appellate counsel; (2) there is insufficient evidence to support his conviction; and (3) ineffective assistance of trial and appellate counsel for failing to contest the admissibility of DNA expert testimony. For the reasons set forth below, this Court recommends denying the petition for habeas relief.

## BACKGROUND

**I.   Facts Established at Trial**

The California Court of Appeal for the Third Appellate District provided the following summary of the facts presented at trial:

////

**1.0 Background**

At the time of her death in late December 2012, the victim[] and defendant were in the process of divorcing after separating in 2009. Their son was three years old, and they had joint custody of him. Apparently "[i]t was ridiculous how much they argued over this child." The victim lived with her parents, and had recently begun dating another man. Defendant was living on Page Court in Modesto with another woman (whom he had been dating since 2010), her older child, and a roommate. The girlfriend was pregnant with defendant's child (who was born in January 2013).

Defendant, his mother and his sister (the latter of whom were both still close to the victim), and the victim's mother all noted that the victim often ran late, and it was not unusual for her to change plans at the last minute (including picking up her child from defendant or his mother). Defendant asserted that the victim had even gone a month without having their child in her custody, and told an investigator that she would go "AWOL" from their son's life. However, defendant's mother and sister also noted that when the victim was unable to come at a designated time, she would call to let them know (or ask defendant's mother to pick up the child for her). The victim was glued to her cell phone, keeping it with her at all times (even in bed).

On Christmas Eve 2012, defendant and the victim had a heated confrontation about her failure to deliver their son to defendant as scheduled. This confrontation occurred at the victim's parents' home with the parents present. Ultimately, defendant left the child with the victim.

Defendant and his girlfriend asserted that they believed his son may have been molested while in the victim's custody, based on the behavior of defendant's son with the girlfriend's daughter and the son's remarks when challenged. They learned this shortly before Christmas. They filed a report apparently on Christmas Day 2012 with the Stanislaus County Sheriff's Department.

On December 26, 2012, defendant and the victim attended a custody hearing at the Modesto courthouse. As he later told an investigator, he had a dispute with the victim at the hearing about returning the child to her custody because of his belief that the son had been molested. The mediator intervened and directed defendant to return the child to the victim until the next day as scheduled, and left the custody arrangements unchanged. They then called child protective services, and "Tonya" interviewed the victim and told defendant that it was okay for the child to be there.

**2.0 The New Year's Eve Timeline**

On New Year's Eve 2012, the victim made plans to go to an adventure movie with her family and her son (because defendant would be working). She spoke with her mother around 2:00 p.m. and asked her to join them, noting that she was on her way from her boyfriend's home to defendant's home to get her son. She also texted

2

a friend about her plans at 1:30 p.m., saying she was going to pick up coffee and then get her son. Her boyfriend testified that shortly before 3:00 p.m., they were still eating in the car at a fast-food restaurant; the victim then dropped him off at his house before driving to defendant's, which was about five miles away.

At 2:53 p.m., the victim's phone received a text from defendant's phone, asking if she would be there by 3:00 p.m. to pick up their son; a text responded, "Yes, I'm on my way." Records show defendant's phone was in the vicinity of his home; the victim's phone company did not keep location records for texts. Defendant's phone then received a text from the victim's phone at 3:26 p.m. stating, "Here." Defendant testified that he looked outside but did not see the victim; he later told his sister that he had also sent the victim a text asking where she was, although cell phone records do not reflect any text activity on his phone between 3:26 p.m. and a 4:18 p.m. text from his mother's phone asking if the victim had picked up the child (his mother's phone was in the vicinity of her residence at all times). Defendant's phone also received a zero-duration call from a nearby friend right after the 3:26 p.m. text; the friend left a message on voice mail at 3:48 p.m.

After texting defendant, his mother's phone texted the victim at 4:20 p.m. to ask if she had the child. The mother's phone finally received a text from defendant's phone at 4:48 p.m. that stated the victim had not yet arrived; defendant's friend also received a text at the same time from defendant's phone telling him to "hold on" while he awaited the victim's arrival. Thereafter, defendant's phone remained in the vicinity of his home through 6:55 p.m., during which time he did not respond to incoming texts or calls. Defendant explained that he had plugged in the phone in the bedroom to charge it during this time and he was in the living room. His girlfriend's phone was also in the vicinity of their home for the entire period of noon to midnight on that day. The girlfriend and defendant testified that they had been at home all day until they went to his mother's house.

At 5:10 p.m., defendant's mother received an odd text from the victim's phone, which apologized for deciding not to pick up her child. It was unusual because it contained misspellings, referred to the victim's son as "him" instead of her pet name for him, and used the word "sorry," none of which was characteristic for the victim.

Among the texts to defendant that went unanswered was one at 5:14 p.m. from his mother's phone, relating that she had just gotten a text that the victim was not coming, and asking defendant to call her about her picking up the child. His mother's phone then received a two-second call originating from the victim's phone that did not connect; the records were thus able to determine the phone's location as being in the vicinity of where the victim's body was later recovered. This call was shortly followed by two apologetic texts to defendant's phone at 5:29 p.m. After this, the phone was disconnected from the network as a result of being turned off or destroyed.

After the period of inactivity, there was a call at 6:56 p.m. from defendant's phone to his nearby friend. Defendant, the girlfriend, and their children drove to the home of defendant's mother to drop off laundry. Defendant's mother did not see who was with defendant, who came inside by himself to drop off the clothes (at trial, she testified she thought it was defendant's friend and their two sons; at the time, she told an investigator that it was the girlfriend). She was aware defendant would be at the friend's house, because that is where she was to pick up her grandson.

The girlfriend testified that after they came home, defendant went over to the home of his friend with his son to play video games until he left for work at 10:00 p.m. His mother picked up the child there about 8:00 p.m. Defendant's friend initially told police that defendant was there only briefly before 6:00 p.m.; at trial, he agreed with defendant's mother and girlfriend that defendant had been with him for a few hours playing games. Defendant's phone was in the vicinity of his job throughout his shift. His phone sent one more text to the victim's phone at 10:21 p.m.

**3.0 The Car Sightings**

A nearby resident noticed the victim's car parked on the shoulder of River Road at about 4:00 p.m. on December 31 as she was driving to Modesto. No one was in the car or around it. When the resident returned from Modesto at about 5:30 p.m., the victim's car was parked facing oncoming traffic on the south side of River Road. She passed by the car twice more that evening, going to a party at 6:30 p.m. and returning close to midnight. This location is about nine and a half miles from defendant's home.

Another couple was driving west on River Road to Modesto for dinner at about 5:30 p.m., and saw a green Honda and a small silver or white car both parked on the north side shoulder, both with their tail lights on. On their return after midnight, the green car was on the south side facing traffic. The witness could see a woman in the car, who appeared to be sleeping with her mouth open and her head atilt.

A third driver was driving through the same location heading west on his way home from Oakdale shortly before 6:00 p.m. He also saw the green car on the south shoulder of the road, and a silver-grey compact on the north shoulder, both with their tail lights on. On the following morning on his way to work, he saw officers around the green car, and he reported his observations. (He also believed he had seen the car there on the morning of New Year's Eve, when it was in fact still in the victim's possession.)

Defendant has a brown convertible Mustang with a black roof, and a green Dodge. His nearby friend owns a primer-grey Accord that is nonoperational because it does not have a smog certificate. The friend's mother-in-law had come by his house about 5:00 p.m. to pick up his son on New Year's Eve; when questioned three months later, she remarked that she did not see his car at that time, although it was there when she returned an hour later to drop off a pizza. At trial, she did not remember the detective asking about her son-in-law's car.

4

**4.0 The Circumstances of the Body**

Responding to a report of an unspecified "collision," officers located the victim's car on River Road just east of McHenry Avenue around 3:30 a.m. on January 1, 2013. The vicinity is pitch black, illuminated only by a flashing light at the intersection about a quarter-mile away. The car was covered with frost (it being about 30 degrees). Its front windows were open, the keys were in the ignition, and the contents of the car, including the victim's purse, were neatly positioned and did not appear to be disturbed. What seemed to be vomit was on the floor behind the driver's seat. Identifying the car through registration records and the victim's driver's license, the officers noted matted-down grass in a trail leading away from the driver's door. As they followed the trail, the slope of the hill rapidly declined. With their flashlights, they could see the victim's frost-covered body at the bottom of the ravine. The record does not indicate anything at the scene connected defendant with the victim's body.

We do not need to describe at length the autopsy findings, as nothing other than DNA evidence connects the victim's death specifically with defendant. Although her body had multiple other injuries, indications that her wrists and ankles had been firmly gripped, and indications of defensive wounds in a struggle, the cause of death was slow asphyxiation from compression of the mouth and nose with a soft object, which resulted in vomiting. The pathologist believed she had died between 3:00 p.m. and 6:00 p.m. on New Year's Eve, within two to four hours after her last meal with her boyfriend. The pathologist did not discuss how long the body may have been lying at the bottom of the ravine.

The only DNA evidence sufficient to identify defendant as the contributor was found underneath one of the victim's fingernails. DNA evidence under another fingernail was only a partial profile consistent with portions of defendant's profile, but insufficient to match him; the expert nonetheless was of the opinion that defendant was the contributor.[2] DNA evidence retrieved from the interior of the victim's car was too incomplete to be interpreted. Only a single fingerprint from the car was sufficient for analysis, but it did not match anyone involved with the victim or anyone in the fingerprint database.

[N.2 To be precise, the expert should have testified only that the DNA was consistent with defendant's profile, and not provided any statistical evidence because it is for the jury to determine the weight to be given the evidence. (*People v. Her* (2013) 216 Cal.App.4th 977, 982.) Defendant does not contend any prejudicial error arose from this testimony.]

Defendant testified that notwithstanding the heated interactions with the victim on Christmas Eve and at the custody hearing on December 26 (the latter including him airing his suspicions of their son's molestation occurring on her watch that he had reported to the police), he and the victim still had sexual relations on the following day at her home while their son watched a video and (at the victim's invitation) on the evening of December 29 when the rest of the

5

household was asleep. This was part of a surreptitious course of conduct of three to six rendezvous every month since their separation three years before. In the course of their sexual activity, defendant's skin cells and saliva would have gathered underneath the victim's fingernails. A defense expert asserted that a study had shown that a third party's DNA could persist under fingernails even with vigorous washing with a nail brush.

**5.0 Aftermath**

In the mid-afternoon on New Year's Day, representatives from both the San Joaquin and Stanislaus County Sheriff's Departments went to defendant's home to interview him. They did not announce their purpose in asking defendant to come with them to make a statement; the latter assumed it was in connection with the molestation report he made to Stanislaus County authorities. Defendant gave consent to a search of his home. (Nothing in the record indicates that the search resulted in any probative evidence.) Law enforcement took defendant and his girlfriend to the San Joaquin County Sheriff's Office in French Camp.

At the station, defendant initially began talking about the reasons he reported the possible molestation, and the confrontation with the victim at the custody mediation.[3] Defendant had been calm up to this point. About a half-hour into the interview, the interrogator first revealed that the victim was dead; defendant appeared stunned, and began to cry. After the interview, a technician took photos of defendant's hands and face. His knuckles were reddened, there was an abrasion on his palm close to the wrist, and redness between his eyebrows, on the base of his nose, and on his cheek. Defendant and his girlfriend testified that he had a skin condition (they believed was eczema) that made his skin sensitive to his work environment at a truck stop and caused redness on his face and hands, and caused his knuckles to crack and bleed.

[N.3 The girlfriend testified that she also assumed this interview related to the molestation report.]

Defendant then went to his mother's home. He was visibly distraught, and was having difficulty talking. He said only that his son was in the custody of child protective services (without explaining the reason) and asked her to try and retrieve him. He did not mention that the victim was dead.

On the following day, defendant went to his mother-in-law's home. She ran out to hug him in the driveway and told him everything would be all right. Because he looked sad, and his eyes were swollen as if he had been crying, she assumed he knew about the victim. But when asked if he had heard about the victim, he said he had not, and she then explained that she was dead. He reacted as if he was hearing this news for the first time, and became upset. Defendant was a pallbearer at the victim's funeral.

Defendant never called his sister to tell her that the victim was dead. She found out about the death through social media.

6

(ECF No. 19-16 at 2–10); People v. McKuin, No. C083248, 2017 WL 6616376, at *1–5 (Cal. Ct. App. Dec. 28, 2017).

## II. Procedural Background

### A. Judgment

A jury convicted petitioner of first degree murder. (ECF No. 19-5 at 65.) The trial court sentenced him to 25 years to life in state prison. (Id. at 161.)

## III. State Appeal, State Habeas, and Federal Proceedings

Petitioner timely appealed his conviction, raising an insufficiency of the evidence argument. The California Court of Appeal affirmed the conviction. (ECF No. 19-16.) Petitioner sought review in the California Supreme Court. (ECF No. 19-17.) On March 14, 2018, the California Supreme Court summarily denied review. (ECF No. 19-18.)

Petitioner sought habeas corpus relief in the California courts, which denied his petitions. (ECF Nos. 19-19 to 19-26.)

The present petition was filed on October 16, 2019. (ECF No. 1.) Respondent has filed an answer. (ECF No. 18.) Petitioner filed a traverse on May 18, 2021. (ECF No. 38.)

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

A court can entertain an application for a writ of habeas corpus by a person in custody under a judgment of a state court on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for an alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) (stating that "a violation of state law standing alone is not cognizable in federal court on habeas.").

This Court may not grant habeas corpus relief with respect to any claim the state court adjudicated on the merits unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). But it may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam) (citing Parker v. Matthews, 567 U.S. 37 (2012)); see also Carey v. Musladin, 549 U.S. 70, 76–77 (2006). Nor may circuit precedent be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Marshall, 569 U.S. at 64.

A habeas corpus petition can invoke § 2254(d)(1) in two ways. First, a state court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts a holding of the Supreme Court or reaches a different result from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405–06). Second, "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 120 S. Ct. at 1522; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination

8

that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 786–87.

A petitioner may also challenge a state court's decision as being an unreasonable determination of facts under § 2254(d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). Challenges under this clause fall into two categories; first, the state court's findings of fact "were not supported by substantial evidence in the state court record," or second, the "fact-finding process itself" was "deficient in some material way." Id.; see also Hurles v. Ryan, 752 F.3d 768, 790–91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient, and the state court opinion may not be entitled to deference). Under the "substantial evidence" category, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012) (quoting Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745 F.3d 984, 999–1001 (9th Cir. 2014)). The "fact-finding process" category, however, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

9

If a petitioner overcomes one of the hurdles posed by section 2254(d), this Court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). For claims upon which a petitioner seeks to present new evidence, the petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

This Court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome if "there is reason to think some other explanation for the state court's decision is more likely." Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court rejects some of petitioner's claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply, and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d at 860.

## ANALYSIS

Petitioner asserts three grounds for relief, one sufficiency of the evidence claim and two ineffective assistance of counsel claims.

////

////

10

### I. Claim Two: Sufficiency of the Evidence

Petitioner claims that there is insufficient evidence to support his conviction for first degree murder. (ECF No. 1 at 4; ECF No. 38 at 23-27.) In response, respondent argues that the state court reasonably rejected petitioner's sufficiency of the evidence claim. (ECF No. 19 at 14–18.)

### A. State Court Opinion

Petitioner raised this claim in his direct appeal. In the last reasoned state court decision, the California Court of Appeal considered and rejected the claim:

> Our focus is on whether it is reasonable to find defendant guilty based on this evidence. Whether the evidence could also support finding another person guilty is irrelevant.
>
> With respect to the issue of identity, a reviewing court can set aside a verdict only where the evidence in support is "so weak as to constitute practically no evidence at all." (*People v. Braun* (1939) 14 Cal.2d 1, 5; accord, *People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) In *People v. Daya* (1994) 29 Cal.App.4th 697, this court noted that it was sufficient to establish identity where there was ample evidence of motive and opportunity, coupled with significant evidence of consciousness of guilt. (*Id.* at pp. 708–712.) Moreover, the Supreme Court's remarks with respect to fingerprints are of equal significance in the post-DNA era: " 'Fingerprint evidence is the strongest evidence of identity, and *is ordinarily sufficient alone to identify the defendant.*' " (*People v. Johnson* (1988) 47 Cal.3d 576, 601.)
>
> In the present case, there was ample evidence of motive in the continuous and heated disputes between defendant and the victim regarding their shared custody of their son. Into this already combustible relationship, just before her death defendant added the fuel of suspicions that their child was molested while under her watch.
>
> As for opportunity, mere moments away from defendant's house the victim was still adhering to her announced intention of picking up her son and taking him to a movie with other members of her family; nothing in the record would account for a truly last-minute change of plans. It is therefore rational to infer that the text message "Here" at 3:26 p.m. was in fact from the victim on her arrival at defendant's home, even absent any corroboration that she arrived. It is difficult to align the evidence of the car sightings with defendant's ability to suffocate the victim, transport her to River Road and dump her down the embankment, place the texts and two-second call from the victim's phone between 5:10 p.m. and 5:29 p.m.in the vicinity of River Road, and have the means of returning home in a second car before going to his mother's house. However, it was for the jury to reconcile the earliest sighting at 4:00 p.m. (ignoring the impossible

11

> sighting on the morning of New Year's Eve) and the sighting of a woman still in the car at near midnight with the timeline of the killing and disposal of the body. It would not have been irrational for the jury to assume the participation of the extremely pregnant girlfriend—who also did not have any interaction with anybody else all afternoon—in at least the disposal of the body (given a motivation to assist the father of her soon-to-be-born daughter), limiting her activity to driving with the children to pick up defendant; the sightings of the second car accord with the activity on the victim's phone, at a time when extreme darkness would have helped cover the disposal of the body even before the second car arrived. That the witnesses did not see defendant around the car does not mean he was not down the embankment at the time they passed.
>
> It is true the record lacks any evidence of where the murder may have taken place, or any connection between defendant and the victim's car. However, the body had defendant's DNA under one fingernail and consistent partial DNA under another (and there was not any evidence that anyone else matched this partial profile). Defendant's explanation for this borders on the ludicrous; while it may not be uncommon for former spouses to continue to have intimate relations with one another, it simply does not seem plausible that the victim would be interested in having sex with defendant on December 27th (and summon him for an encore on the 29th) after a heated argument on the 24th, being reported to child protective services on the 25th (leading to an interview with a social worker on the 26th), and having a face-to-face argument at the custody hearing on the 26th about the molestation accusation. While there might be *other* plausible reasons for the victim to have defendant's DNA under her fingernail(s), that does not mean it was irrational for the jury to conclude the transfer occurred while defendant was smothering her.
>
> Furthermore, the jury could have rationally taken this specious explanation as evidence of consciousness of guilt. Although we do not believe that deviation from some presumed template of grief also unerringly points to consciousness of guilt, defendant's failure to speak of the victim's death to his mother or sister (both of whom were still close to the victim), and to act as if he was unaware of her death when talking to the victim's mother are nevertheless curious, and thus to some extent would support a rational inference of additional consciousness of guilt.
>
> Accordingly, this evidence is sufficient to support the verdict. This is not to say that it is the conclusion we might reach in the first instance, or that it leads *inevitably* to a finding of guilt. But it is sufficient to establish that the verdict was not based merely on speculation. We therefore reject defendant's argument.

(ECF No. 19-16 at 10–12.)

////

////

////

12

**B. Discussion**

A petitioner is entitled to habeas corpus relief on a sufficiency of the evidence claim, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); see also Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). This inquiry involves two steps. First, the federal court must review the evidence in the light most favorable to the prosecution. Jackson, 443 U.S. at 319. If there are conflicting factual inferences, the federal court must presume the jury resolved the conflicts in favor of the prosecution. Id. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."); McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam). Second, the federal court will "determine whether the evidence at trial, including any evidence of innocence, could allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." United States v. Nevils, 598 F.3d 1158, 1165 (9th Cir. 2010) (en banc).

Although this Court's review is grounded in due process under the Fourteenth Amendment, the Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16; Juan H. v. Allen, 408 F.3d 1262, 1275–76 (9th Cir. 2005). This Court will look to state law to establish the elements of the offense and then turn to the federal question of whether the state court was objectively unreasonable in concluding that there was sufficient evidence supported the conviction. See Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018).

"After AEDPA, we apply the standards of *Jackson* with an additional layer of deference." Juan H., 408 F.3d at 1274; see Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). On direct appeal at the state level, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam). On habeas review, "a

federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Petitioner was convicted of first degree murder, which is the "unlawful killing of a human being…with malice aforethought." Cal. Penal Code § 187(a). Here, the state court's finding that there was sufficient evidence to support the conviction was not objectively unreasonable. The state court reasonably found that the record showed that petitioner had motive and opportunity to commit the crime and had consciousness of guilt. As to motive, petitioner and the victim were engaged in "continuous and heated" custody disputes, and "just before her death[,] [petitioner] added the fuel of suspicions that their child was molested under her watch." (ECF No. 19-16 at 11; see also ECF No. 19-9 at 73–74; ECF No. 19-10 at 86–91.) Regarding his opportunity to commit the crime, the state court noted that while in close proximity to petitioner's house, the victim expressed that she was on her way to pick up their son from petitioner's house around 3:00pm and take him to the movies with her family. (ECF No. 19-16 at 11; see also ECF No. 19-9 at 47–49; ECF No. 19-10 at 164–65, 188–89.) At 3:26pm, the victim sent the text message "[h]ere" to petitioner, but no one corroborated her arrival. (ECF No. 19-16 at 11; ECF No. 19-10 at 98–99; ECF No. 19-11 at 65.)

Although the car sightings at the crime scene provided some conflicting information, the state court correctly identified that "it was for the jury to reconcile the earliest sighting at 4:00pm (ignoring the impossible sighting on the morning of New Year's Eve) and the sighting of a woman still in the car at near midnight with the timeline of the killing and disposal of the body." (ECF No. 19-16 at 11.) On habeas review, this Court must resolve such conflicts in favor of the prosecution. Jackson, 443 U.S. at 326. Despite no evidence of "where the murder may have taken place, or any connection between [petitioner] and the victim's car," there was circumstantial evidence connecting petitioner to the crime including his DNA profile under two of the victim's fingernails. (ECF No. 19-16 at 12; see also ECF No. 19-10 at 826.) The state court rejected as implausible petitioner's explanation that he had intimate relations with the victim on December

14

27 and 29; just days before, petitioner and the victim had heated arguments regarding child custody and child molestation accusations. (ECF No. 19-16 at 12 ("While there might be *other* plausible reasons for the victim to have defendant's DNA under her fingernail(s), that does not mean it was irrational for the jury to conclude the transfer occurred while defendant was smothering her.")) Lastly, the state court noted that petitioner showed consciousness of guilt by faking knowledge of her death and providing an implausible explanation for his DNA under the victim's fingernails. (Id.)  Because fairminded jurists could disagree with the state court's decision that there was sufficient evidence to support the guilty verdict, this Court recommends denying habeas relief on this claim.

**II.    Claims One and Three: Ineffective Assistance of Counsel**

In claims one and three, petitioner argues that both his trial and appellate counsel provided constitutionally ineffective assistance of counsel. In claim one, petitioner asserts that his appellate counsel should have argued that the evidence was "insufficient as a matter of law to support guilt beyond a reasonable doubt," instead of raising "an inferior issue of proof of identity." (ECF No. 1 at 4; ECF No. 19-25 at 8, 28-29.) In claim three, he contends that both trial and appellate counsel should have objected to the admissibility of DNA expert testimony. (Id. at 5.)

**A. State Court Opinion**

Petitioner raised these claims for the first time in a state habeas petition. (ECF No. 19-25.) The California Supreme Court summarily denied the petition. (ECF No. 19-26.) "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

**B. Discussion**

To state an ineffective assistance of counsel claim, petitioner must show that (1) his counsel's performance was deficient, falling below an objective standard of reasonableness, and (2) his counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687–88 (1984). For the deficiency prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted). For the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (internal citations omitted); see also Landrigan, 550 U.S. at 473. When § 2254(d) applies, the "question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." Richter, 562 U.S. at 105.

As to petitioner's first claim—that appellate counsel was ineffective for failing to argue the insufficient evidence standard under Jackson v. Virginia, 443 U.S. 307 (1979)—the state court's rejection of this claim was not objectively unreasonable. In the opening appellate brief, petitioner's appellate counsel cited Jackson and argued that "[t]he constitutional aspect of a sufficiency challenge is that, to satisfy the Due Process Clause, substantial evidence must exist for each element." (ECF No. 19-13 at 36.) The opening brief also noted that the "parties agreed below the only question for the jury to decide was *who* killed [the victim]." (Id.) Because the murderer's identity was the only issue before the jury, the state court could have reasonably concluded that petitioner's appellate counsel was not deficient.

In claim three, petitioner asserts that his trial and appellate counsel were ineffective because they failed to object to the prosecution's DNA expert's statistical evidence testimony. (ECF No. 1; see also ECF No. 19-15 at 29.) Petitioner does not provide any additional facts or law to support his claim, but he seems to be referring to a footnote in the state court's opinion stating, "[t]o be precise, the expert should have testified only that the DNA was consistent with defendant's profile, and not provided any statistical evidence because it is for the jury to determine the weight to be given the evidence…Defendant does not contend any prejudicial error arose from this testimony." (ECF No. 19-16 at 8 n.2.) During trial, an expert testified that for one fingernail sample, the "second contributor profile is consistent with [petitioner's] profile." (ECF

16

1 No. 19-10 at 18.) For the second sample, the "minor partial profile is consistent with [petitioner's] profile." (Id. at 21.) The expert also testified that he did a statistical analysis to see "how rare or how common that profile is in a given population" and concluded that the DNA belonged to petitioner. (Id. at 19.)

After reviewing the record, this Court concludes that the California Supreme Court could have reasonably concluded that counsel's failure to raise this issue at trial or on appeal did not constitute prejudicial error. Petitioner does not dispute the expert's testimony that petitioner's DNA was a contributor in two samples. He provides no explanation as to how, but for counsels' error in not objecting to the statistical testimony, the absence of this evidence would have created reasonable probability of a different result. Mere speculation that it would have been different is not enough to warrant habeas relief. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific fact do not warrant habeas relief.") Because the state court's determination was not contrary to, or an unreasonable application of clearly established federal law, this Court recommends denying habeas relief on these claims as well.

**CONCLUSION**

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision on any claim was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts.

Further, it is RECOMMENDED that petitioner's petition for a writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served on all parties and filed with the court within seven (7) days after service of the

objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: April 6, 2023

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE